UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY BOMMARITO,

                Plaintiff,                  CASE NO. 05-CV-73359

-vs-                                PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

GROSSE POINTE YACHT CLUB,

                Defendant.

_____/

**OPINION AND ORDER**
**(1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;**
**(2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO**
**FEDERAL CLAIMS; AND (3) DECLINING TO EXERCISE SUPPLEMENTAL**
**JURISDICTION OVER STATE LAW CLAIMS**

      Before the Court are: (1) Plaintiff's November 3, 2006 Motion for Partial Summary

Judgment on the ERISA discrimination claim (Docket No. 39); and (2) Defendant's November 6,

2006 Motion for Summary Judgment (Docket No. 40). The Court held a motion hearing on March

15, 2007. Having considered the entire record, and for the reasons that follow, the Court DENIES

Plaintiff's Motion for Partial Summary Judgment, GRANTS Defendant's Motion for Summary

Judgment, and DISMISSES WITHOUT PREJUDICE Plaintiff's state law claims.

**I.**      **BACKGROUND**

      This case arises out of Plaintiff Mary Bommarito's ("Plaintiff") termination from her

employment at Defendant Grosse Pointe Yacht Club ("Defendant").

      Plaintiff is a resident of the City of Harper Woods in Wayne County, Michigan. (2d Am.

Compl. ¶ 2). Defendant is an entity doing business in the City of Grosse Pointe in Wayne County,

Michigan. (2d Am. Compl. ¶ 3).

Plaintiff began her employment with Defendant during the Spring of 1979 as a waitress, and subsequently held a position as a banquet server on a full-time basis. (2d Am. Compl. ¶¶ 6-7). Defendant's job description for a banquet server required the employee to be able to lift a minimum of thirty (30) pounds. (Def. Br. Ex. B, Banquet Server Job Description). As an employee of Defendant, Plaintiff enjoyed employee plan benefits including, but not limited to, health and disability insurance. (2d Am. Compl. ¶ 9).

During May of 2003, Plaintiff began to suffer back pain that was diagnosed by October 2003 as attributable to breast cancer. (2d Am. Compl. ¶¶ 10-12). Plaintiff underwent surgery in November 2003, and then had to endure extensive radiation and chemotherapy sessions from December 2003 to July 2004. (2d Am. Compl. ¶¶ 13-15). During the course of these treatments, Plaintiff could not return to work. (2d Am. Compl. ¶ 16). Due to Plaintiff's condition, her physician placed work restrictions on her. (2d Am. Compl. ¶ 20).

Upon Plaintiff's request, Defendant granted her a Medical Leave of Absence on November 5, 2003. (2d Am. Compl. ¶ 18). On April 21, 2004, Plaintiff was granted an extension of her medical leave for continued treatment. (2d Am. Compl. ¶ 19). Plaintiff alleges that throughout her leave and disability, she continued to be an active employee of Defendant and continued to participate in the employee welfare benefit plan. (2d Am. Compl. ¶ 21).

On or about July 22, 2004, Plaintiff presented Defendant medical documentation that she was able to return to work. However, there was a medical restriction that she not be required to lift more than ten (10) pounds with her right arm. (2d Am. Compl. ¶ 28). Plaintiff alleges that she informed Defendant that her lifting restriction could be accommodated by allowing her to hostess,

2

supervise, or to have a bus-boy help her on any occasion requiring her to lift more than ten pounds. Plaintiff was also willing to perform any other job within her lifting restriction. (2d Am. Compl. ¶ 29). She claims that Defendant refused to permit her to return to work and to accommodate her disability. (2d Am. Compl. ¶ 30).

During this time, Plaintiff alleges that three positions became available at Defendant that could accommodate her restriction: hostess, supervisor in the food and dining room, and catering sales director. Plaintiff applied for the positions, but was turned down for each of them. (2d Am. Compl. ¶¶ 31-33, 37).

Plaintiff was terminated on October 20, 2004. (2d Am. Compl. ¶ 22; Def. Br. Ex. E, Oct. 20, 2004 Tallerico Letter). Two weeks after her termination, Defendant hired a new full-time waitress to replace her. (2d Am. Compl. ¶ 40).

Plaintiff filed a charge of discrimination with the EEOC. The EEOC declined to pursue the case because it found that Defendant was a "bona fide private membership club," thus not subject to the Americans with Disabilities Act ("ADA"). The EEOC issued Plaintiff a Right to Sue Letter on July 1, 2005. (2d Am. Compl. Ex. A).

Plaintiff filed her Second Amended Complaint on September 7, 2006. The Complaint alleges the following causes of action:

Count I:      Americans with Disabilities Act
Count II:     Persons with Disabilities Civil Rights Act (state law)
Count III:    Breach of Contract (state law)
Count IV:     Promissory Estoppel (state law)
Count V:      ERISA Discrimination

Plaintiff filed her Motion for Partial Summary Judgment on the ERISA discrimination claim on November 3, 2006. Defendant filed its Motion for Summary Judgment on all of

Plaintiff's claims on November 6, 2006.

## II.   ANALYSIS

### A.   Standard of Review

`        Pursuant to Federal Rule of Civil Procedure 56(b), a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*. In making this evaluation, the court must examine

4

the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

### B.    Bona Fide Private Membership Club under ADA

The threshold question that the Court must answer in the instant case is whether Defendant is exempted from liability under the ADA under the "bona fide private membership club" provision.

Title 42 U.S.C. § 12111(5) defines "employer" for the purposes of the ADA:

(A) In general

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years

following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

(B) Exceptions

The term "employer" does not include –

     (I)     the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or
     (ii)    a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26.

42 U.S.C. § 12111(5).

The parties agree that Defendant is tax-exempt for the purposes of 26 U.S.C. § 501(c)(7).

(Def. Br. Ex. I, Articles of Incorporation; Ex. J, 2004 Tax Returns).

The Court notes that the Sixth Circuit has yet to address the appropriate criteria in evaluating whether an organization should be deemed a "bona fide private membership club" for the purposes of federal discrimination statutes. Neither case cited by Defendant – *Wolgat v. Tam-O-Shanter Country Club*, 142 F.3d 438 (6th Cir. 1998) (table opinion), nor *Kemerer v. Davis*, 520 F. Supp. 256 (E.D. Mich. 1981) – addresses the criteria for determining whether an organization falls under the exception.

Title 28 C.F.R. Ch. 1 App. B § 36.104 enumerates some of the factors that courts look to in determining whether an entity is a "private club," and exempt from ADA requirements:

     (1)     the degree of member control of club operations,
     (2)     the selectivity of the membership selection process;
     (3)     whether substantial membership fees are charged;
     (4)     whether the entity is operated on a nonprofit basis;
     (5)     the extent to which the facilities are open to the public;
     (5)     the degree of public funding; and

6

(6)     whether the club was created specifically to avoid compliance with the Civil Rights Act.

The EEOC Compliance Manual, Section 2-III states that for an organization to enjoy the ADA exemption, (1) the organization must be a club in the ordinary sense of the word; (2) the organization is "private"; and (3) there are "meaningful conditions of limited membership."

The parties do not dispute that Defendant meets the first prong – that Defendant is a "club" in the ordinary sense of the word.

In regards to the second prong, the EEOC Compliance Manual considers the following when determining whether a club is "private": (1) the extent to which it limits its facilities and services to club members and their guests; (2) the extent to which and/or manner in which it is controlled or owned by its membership; and (3) whether and, if so, to what extent and in what manner it publicly advertises to solicit members or to promote the use of its facilities or services by the general public. The Manual further observes that "[t]he presence of absence of any one of these factors is not determinative, however, and the question as to whether an organization is private must be addressed on a case-by-case basis."

Courts have also set forth various criteria for evaluating whether an organization is a "private membership club." These variables include: (1) genuine selectivity; (2) membership control; (3) history of organization; (4) use of facilities by nonmembers, (5) the organization's purpose; (6) whether the club advertises for members; and (7) whether the club is non-profit. *United States v. Landsowne Swim Club*, 713 F. Supp. 785 (E.D. Pa. 1989); *Martin v. PGA Tour, Inc.*, 984 F. Supp. 1320, 1324-25 (D. Or. 1998), *aff'd* 204 F.3d 994 (9th Cir. 2000). Because of the importance of federal discrimination laws, courts have narrowly construed exemptions under the

7

ADA and place the burden upon the party claiming the exemption. *Quijano v. Univ. Fed. Credit Union*, 617 F.2d 129, 131-32 (5th Cir. 1980); *Nesmith v. YMCA*, 397 F.2d 96, 101 (4th Cir. 1968).

In considering the third prong, whether the club has "meaningful conditions of limited membership," the EEOC Guidelines look to "the size of the membership, including the existence of any limitations on its size, and membership eligibility requirements."

Defendant urges the Court to analogize the instant facts to the Seventh Circuit decision in *EEOC v. Chicago Club,* 86 F.3d 1423 (7th Cir. 1996). In *Chicago Club*, the EEOC brought an action for declaratory and injunctive relief against the defendant club, alleging that the club was required to comply with Title VII reporting requirements.

The club members owned the club and elected eleven members to serve terms of four years on the board of governors. *Id.* at 1426. The board of governors oversaw all of the club's management and operations and appointed a general manager who reported directly to the board. *Id.* Membership in the club was divided into twelve classes and was established in one of two ways. *Id*. First, one member could nominate a candidate, with two members to second the proposal. Two directors would have to be acquainted with the candidate for "resident" membership, and one director for "nonresident" membership. *Id.* The names of the candidates would be posted to the present members of the club, who could in turn provide comments to the secret membership commission. *Id.* The board would receive the recommendations from the secret commission and extend memberships. *Id.* The second avenue of membership was via direct election by members of the board of governors, with the opposition of two directors being sufficient to block the election. *Id.* All candidates had to be in "good standing" and over the age of

8

twenty-five. *Id.* The club's members came from a "a narrow band of the sociological spectrum," most being CEOs, CFOs, corporate presidents, among others. *Id.*

Members were permitted to use the club's facilities for their own use and also to host functions, which could include nonmember guests. *Id.* at 1427. Nonmember guests could use the facilities under the sponsorship of a member. *Id.* Members could obtain a "guest card" for nonmembers, which allowed the latter to use the club facilities for up to fourteen days. Nonmembers with these cards could use the club without the presence of a member sponsor. *Id.* Nonmember cardholders could bring other nonmembers, but could not request guest cards for them. *Id.* Spouses of members could invite nonmember guests, but also could not procure a guest card. *Id.*

The club allowed its members to host functions for outside and private organizations, provided that the host member attended. *Id.* The member would be responsible financially for the function, but could be reimbursed by third-party nonmembers. *Id.* The record also revealed two instances where nonmembers hosted functions: (1) the general manager of the club hosting an event for university students; and (2) the club permitted a culinary team to use its kitchen for a national competition. *Id.*

Under the above facts, the Seventh Circuit held that the club was both "private" and had "meaningful conditions of limited membership." In finding the club to be "private," the court found significant the facts that the nonmembers did not have "unrestricted access" to the club and that the privileges attached to nonmembers with guest cards were not "coextensive with membership privileges." *Id.* at 1435. The court did not find that the practice of allowing members to host private functions, even with nonmember reimbursement, to "compromise" the club's

9

private nature. *Id.* The court further did not find that occasional hosting of outside parties, even without sponsorship of a member – in that instance, university students or the culinary competition – had any effect on the club's "private" nature. *Id.* Finally, the court noted that the club's peer-selection procedure was meaningful; intensely personal screening was employed. *Id.* at 1437.

Similarly, the court in *Kelsey v. Univ. Club of Orlando, Inc.*, 845 F. Supp. 1526 (M.D. Fla. 1994), found that the club satisfied both the "private" and "meaningful conditions" criteria. The court found the plaintiff could not show that nonmember guests had unfettered use of the club's facilities or that the club promoted the use of its facilities through advertisements aimed at non-members. *Id.* at 1530. Additionally, the court held that the club's procedure for admitting members, where current members would sponsor and vouch for the candidate's suitability for membership, character, good standing, and financial responsibility, constituted "meaningful conditions of limited membership." *Id.* at 1531.

1.      Private Club

Under either the EEOC Guidelines or case law, in assessing whether a club is "private," the Court looks to (1) the extent that the club's facilities or services are limited to club members and their guests; (2) the extent to which the management of the club controls the club and its access; and (3) whether the club advertises publicly for new membership or publicly advertises for its services.

Defendant proffers various provisions in its Rules and Bylaws to support its contention that the club is "private." (Def. Br. 3, Ex. G, Grosse Pointe Yacht Club Rules and Bylaws). The Rules provide that the clubhouse and facilities "are for the exclusive use of members and their

immediate families and guests." (*Id.* at 209). Non-member out-of-town guests are allowed access to the club for a period "not to exceed two weeks," but must be sponsored by a member and are required to carry a "temporary guest card. . . . at all times." (*Id.*). Guests may only be invited by a member or a member's spouse, and cannot be admitted more than once in a month, unless approved by the executive committee. (*Id.* at 214). If members cannot personally accompany the guests upon their arrival, the guests must register their names with the club until the member arrives. (*Id.*). Members cannot sponsor guests that they know to be "objectionable" to the club. (*Id.*). If guests violate the rules of the Club, a member of the executive committee informs the sponsoring member, who must inform the guests that they may no longer enjoy the club's privileges. (*Id.*).

Other than "Guests," Defendant also recognizes "Visitor" status. Visitors are those from "a club recognized and approved by the Board of Directors." Visitors must obtain "special permission from [the] General Manager upon a request" and cannot "be admitted to the Club more than twice in one year. . . ." (*Id.*). Guest and visitors are not permitted to bring other visitors and guests, unless granted special permission by the general manager. (*Id.*). Those guests and visitors who are "from a recognized and approved club" and have a "guest card" can pay for "food, beverage, sports activities, etc." (*Id.* at 215). The club can exclude visitors and guests when "the facilities of the club will be overtaxed by use of its members and their immediate families." (*Id.*).

In terms of restrictions on the access for specific facilities, guests who have permission from a member to use a member's boat must comply with the guest and harbor rules. (*Id.* at 222). Guests may only use the swimming pool "upon invitation by a member and only accompanied by that member." (*Id.* at 225). Sponsoring members are also charged a fee to bring guests to the pool.

11

(*Id.*). For use of the tennis courts, the sponsoring members are charged a fee for usage by their guests. (*Id.* at 227). Guests may not outnumber members on the tennis court at any given time. (*Id.*). In order to use the platform tennis facilities, members must accompany their guests, and "no more than two guests per court will be allowed." (*Id.* at 234). Members are also responsible for their guests' behavior and care of the courts. (*Id.*).

Defendant's bylaws provide that "the entire business of the Club, its property, assets and all matters of any kind relating to its interest and advancement shall be under the control, management and direction of 12 directors who shall be elected from the voting members of the Club." (*Id.* at 241). At each annual meeting, four directors are elected to serve terms of three years. (*Id.* at 240). The "Commodore," or chairperson of the board, creates a nominating committee of the past last seven available Commodores. (*Id.* at 241). The nominating committee then entertains "written recommendations" for potential directors for a period of thirty days. (*Id.* at 242). Additional nominees may be named upon the written request of any 25 voting members. (*Id.*). The nominating committee then placed a minimum of 1.5 (rounded downward) to 2 candidates for each director vacancy. (*Id.*). Each voting member has one vote for each available director slot, votes on an official ballot, and can vote on the appointed election day from noon until 8:00 p.m. (*Id.*). The board of directors has the authority to issue absentee ballots. (*Id.*).

The board of directors elects officers to hold the positions of "Commodore," "Vice Commodore," "Rear Commodore," "Secretary," and "Treasurer." (*Id.*). The bylaws then establish procedures for the makeup and appointment of various standing committees within the club. (*Id.* 242-43).

Plaintiff responds that Defendant's facilities are not limited to its members and guests and

12

that Defendant publicly advertises for its events and for its facilities.

First, Plaintiff offers the Affidavit of Loraine Johnston, who was Defendant's catering director for 8-10 years, until her separation on January 2005. (Pl. Br. Ex. O, Johnston Aff.). She stated that during the "last few years" at Defendant, "the membership rules became less strict and the Club became more lenient as to whom it would allow in." (*Id.* ¶ 19). She observed that, in relation to membership sponsors, Defendant's recent practice was to "call members and ask them to sponsor people. This had never been done before." (*Id.*). She also stated that Defendant began to relax its rules about non-member private parties, eliminated the waiting period for non-members to book functions, and modified its billing for non-member functions to make it appear that these events were member functions and not sponsored functions." (*Id.* ¶¶ 20-22).

Plaintiff further maintains that Defendant earns a substantial amount of revenue from "non-member revenue," thus undercutting Defendant's claim that its facilities are limited only to members and guests. Plaintiff attaches (1) an undated copy of Defendant's Banquet Policies; (2) a Summary of Unrelated Business Income from October 1, 2003 to September 30, 2005; and (3) various public advertisements for events and classes held at Defendant.

Upon examination of Defendant's Banquet Policies, it is not clear to the Court how it is helpful to Plaintiff's argument. The policy states that the club "exists solely for the pleasure and enjoyment of Members, their families, and guests in a setting of privacy, exclusivity and dignity." (Pl. Br. Ex. P, GPYC Banquet Policies). Additionally, the club "is for personal or direct business use of a yacht club Member or sponsored by a Member." (*Id.*). The policy restricts "public advertising, public notices, promotions or coverage in any media (newspaper, radio, television or general circulation publications) of any event to be conducted at Club without the express written

13

permission of the Board of Directors. Any violation . . . . will result in the immediate cancellation of the function." (*Id.*). The club prohibits "[e]vents to which the general public is invited." (*Id.*). The Court fails to see how this brochure suggests that access to the club is not restricted to Defendant's members and guests.

Next, Plaintiff submits two financial documents from Defendant to show that it derives a significant amount of its revenue from non-member sources. (Pl. Br. Ex. Q, Summary of Unrelated Business Income for Period from Oct 1, 2003 to Sept. 30, 2004 and from Oct. 1, 2004 to Sept. 30, 2005). The documents appear to be spreadsheets, breaking down Defendant's revenues by source. Defendant's "non-member revenue" category includes both "non member charges" and "other club's charges." During the October 2003 to September 2004 period, Defendant earned approximately 12% of its revenue from "non-member sources." From October 2004 to September 2005, Defendant earned 13% of its revenue from "non-member sources." Defendant earned additional income in 2004 and 2005 for renting space on its property for a cellular telephone tower on its property.

However, Plaintiff does not attempt to explain how "non-member charges" arise or describe what "other club's charges" means. The Court will not speculate as to how Defendant earns revenue from non-members and other clubs. Therefore, these documents, without meaningful interpretation, cannot support Plaintiff's proposition that Defendant's facilities are advertised or otherwise open to the public.

Plaintiff contends that Defendant offers non-member classes in sailing, thus demonstrating that the club advertises its facilities and services to the public. (Pl. Br. Ex. R, Grosse Pointe Public

14

School System Community Education Classes, Spring – Summer 2005). The advertisement,

appearing in a continuing education brochure for the Grosse Pointe Public School System, states:

> Grosse Pointe Yacht Club Adult Sailing Program
>
> Classes focus on the fundamentals of sailing, upwind & downwind, knots, nomenclature, basic right of way rules, and boat handling, Small class sizes and a large amount of tiller time provides you with a solid sailing foundation.
>
> Group Rates Available: Open to Non-Members

(*Id.*). The fees for the class were $400.00 for "adult keelboat program," and $250.00 for "adult

dinghy program." (*Id.*).

Plaintiff also cites a 2005 newspaper article describing a "muskie fishing" charity event

co-sponsored by Defendant, the Detroit Athletic Club, and the Michigan Ontario Muskie Club.

(Pl. Br. Ex. R, "GYPC to Host Special Muskie Tourney for Children's Special Olympics," Grosse

Pointe News, May 26, 2005). The article states that the fee for the event was $125.00, and

included fishing tackle, beverages, and dinner. (*Id.*). The three clubs expected to raise "$10,000,

which will benefit children at the Special Olympics." (*Id.*).

Finally, Plaintiff puts forth an advertisement appearing in several Southeastern Michigan

newspapers for "18th Annual Yachtsmen's Weekend."[1] (Pl. Br. Ex. R, Advertisements). The

advertisement reads:

> 18th Annual Yachtsmen's Weekend
> An exclusive showing of premier power and sailing yachts in the GPYC Harbor
> Saturday and Sunday
> May 20th and May 21st

---

[1] Plaintiff attaches copies of the advertisement from the following newspaper editions: West Bloomfield Eccentric, May 14, 2006; Grosse Pointe News, May 11, 2006; Birmingham Eccentric, May 8, 14, and 15, 2006; Troy Eccentric, May 14, 2006; Southfield Eccentric, May 14, 2006; Rochester Eccentric, May 14, 2006.

15

> Boat Show
> Noon – 5:00 p.m.
> Boston Whaler Raffle Drawing
> Donated by Colony Marine

(*Id.*). At the bottom of the advertisement appeared the logos of several companies, presumably the sponsors of the event.

In response to Johnston's affidavit, Defendant offers the affidavit of Julie Kruschinska, Defendant's assistant general manager from February 2000 to May 2005. (Def. Reply Ex. E, Glandon Aff.). Kruschinka states that she is not aware of any exceptions to the member sponsorship policy for club functions during her employment at Defendant. (*Id.* ¶ 7).

In response to the Plaintiff's evidence of the "muskie fishing" event, the sailing school, and the Yachtsmen's Weekend, Defendant offers an affidavit from Michael Mooney, Defendant's general manager since October 2002. Mooney states that these activities were a part of Defendant's participation in regional associations of other area clubs or as an extension of Defendant's Yachtsmen's Committee. (Def. Reply Ex. C, Mooney Aff. ¶ 12). His affidavit further states that these activities were sponsored by club members and participants, either by Defendant's members or other private clubs that were invited to participate. (*Id.*). Finally, "[n]one of the participants were afforded full use of the Club's facilities or other entitlements or benefits of membership." (*Id.*).

The Court finds that Defendant has carried its burden to satisfy the "private" club factor. Initially, the Court notes that the instant facts closely parallel those the Seventh Circuit confronted in *Chicago Club*. In finding that the defendant was a "private" club, the court emphasized that the club was managed and operated by a board of directors and that the club's use was reserved for its

members and their guests. Guests could have access to the club, only with the sponsorship of a

member, and only for up to fourteen days. The court found that "guest card" access was not "co-

extensive" with membership. The fact that members could host private functions, including non-

members, or with third-party financial reimbursement did not "compromise" the private nature of

organization. The fact that the club on occasion sponsored events that included members of the

public also did not qualify as destroying its "private" nature.

Defendant here has likewise demonstrated that the club was restricted to members, their

guests, and visitors who enjoy temporary reciprocal membership via another club. Guests and

visitors were required to obtain "guest cards," and could only use the facilities for a fixed amount

of time. Defendant further vests the ownership and management of the club to a certain class of its

members.

Plaintiff's evidence does not present a genuine issue of material fact on this issue. The fact

that Defendant hosted the "muskie fishing" charity event on its premises, or that its two-day

annual boat show was open to the public, does not demonstrate that Defendant's facilities and

services are, or were, open or advertised for public use. *See Chicago Club*, 86 F.3d at 1426

(observing that two incidents were non-member organizations utilized the club's facilities without

member sponsorship did not disrupt the "private" status club). Johnston's observations that

Defendant was somehow becoming less vigilant about non-member events also is insufficient to

show that Defendant does not satisfy the "private" club criteria. *See Kelsey*, 845 F. Supp. at 1530

(holding that a party's evidence demonstrating only "isolated incidents" of failure to abide by

club's policies involving non-members was insufficient to show the club was not "private.").

Furthermore, Defendant's Banquet Policies also reflect the fact that events at the club require

member sponsorship. The fact that members sponsor or host non-member events, which are ultimately paid for by the non-member organization, does not have any import on "private" status. *See Chicago Club*, 86 F.3d at 1436 ("It is common practice for business people to entertain colleagues and host functions or lunches at private clubs and then be reimbursed for the costs by an employer or professional association."). Finally, Plaintiff has not shown that the individuals attending sailing classes offered by Defendant had co-extensive access with members to club's facilities.

Therefore, the Court holds that Defendant meets the "private" club criteria.

2.      Meaningful Conditions of Limited Membership

In order for Defendant to satisfy the "meaningful conditions of limited membership" factor, the Court looks to the eligibility requirements for membership, size, and other limitations of membership.

In order to be eligible for election as a member of Defendant, an applicant must be over 21 years of age. (Def. Ex. G 238). The bylaws create a "minimum procedure" for membership. "The application must be in writing, signed by the applicant, endorsed by three members of the Club (only one of whom may be a current member of the Board of Directors) and filed in the Club office." (*Id.*). Defendant then posts the name of the applicant on the club's announcement board for fourteen days. (*Id.*). Defendant advises the voting members by mail of the candidate's pending application. (*Id.*). When these requirements have been fulfilled, the board of directors may vote, by secret ballot, on the candidate's application. (*Id.*). Upon objection by two directors, the balloting can be postponed until the next regular meeting. (*Id.*). If on the secret ballot, the

opposing votes of three directors "constitute unfavorable action on the application." (*Id.*). Applications may also be reconsidered by the board at any regular meeting. (*Id.*).

Defendant's Bylaws create ten classes of membership, with only three (active, senior, and life members) having the rights to vote on club matters, to hold office, and to have an ownership interest in the club. (*Id.* 235). The other seven categories – social, senior social, non-resident, non-resident senior, surviving spouses, and clergy – do not hold any management, voting, or ownership interest in the club. (*Id.* 236-37). The bylaws provide for termination of membership for various reasons (failure to pay dues, "for cause," etc.) and also for changes in membership classification. (*Id.* 238-40). The board of directors establishes the "initiation fee" and "transfer fees" for the different classes of membership. (*Id.* 244).

Plaintiff responds that Defendant's bylaws do not establish any membership criteria, only the endorsement of three current members.

The Court finds that Defendant's selection criteria closely parallel those in *Chicago Club* and *Kelsey*. In *Chicago Club*, membership was divided into twelve classes. Candidates were nominated by three current members, and their names posted in the club, so that other members could make confidential recommendations to the membership commission. The candidates all needed "good standing" and be over twenty-five years old.

> By participating in the selection process, members guarantee that the interests in they share with other members will continue to bind the membership in the future.
> . . . .
> That the Club's bylaws do not painstakingly describe the subtleties inherent in this personal selection process in no way diminishes the practical significance of this practice. Indeed, the very nature of a private club suggests this practice to be the best available course.
> . . . .

> We emphasize that by no stretch of the imagination should the practices of the Club outlined above be considered as the minimum necessary to qualify as a bona fide membership club under § 2000e(b). To the contrary, it is clear that less stringent membership policies and guest arrangements than those employed by the Club would easily meet § 2000e(b)'s bona fide private membership club requirements.

*Id.* at 1436-37.

Here, Defendant requires a candidate's written application, the sponsorship of three current members, the posting of a candidacy at the clubhouse, the consideration by the board of directors, and a secret ballot. Thus, the Court holds that these procedures provide for an adequate personal screening and constitute "meaningful limitations on membership."

Since Defendant has met its burden to show that it is entitled to ADA exemption as a "bona fide private membership club," the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's ADA claim.

### B.      ERISA Discrimination Claim

Section 510 of ERISA states:

> It shall be unlawful for any person to discharge . . . . a participant or a beneficiary . . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan.

29 U.S.C. § 1140.

In order to state a claim under § 510, a plaintiff may demonstrate that the defendant "had a specific intent to violate ERISA through either direct or circumstantial evidence." *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 536-37 (6th Cir. 2005) (citation omitted). "Direct" evidence "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 537 (quotation and citation omitted). Absent direct evidence, a plaintiff can state a *prima facie* case by showing (1) prohibited employer conduct (2) taken for the purpose

20

of interfering (3) with the attainment of any right to which to employee may become entitled. *Id.* If the plaintiff can establish a prima facie case, then the defendant must present a nondiscriminatory reason for its challenged action. *Id.* If defendant establishes a legitimate reason, the plaintiff must then demonstrate that the defendant's explanation was "pretextual." *Id.* Finally, the plaintiff must show a "'causal link' between the adverse employment decision and the loss of benefits." *Id.* (citation omitted).

Both parties move for summary judgment on Plaintiff's § 510 claim. The Court finds that since Plaintiff was not entitled to any present or future ERISA benefit under Defendant's plan, Plaintiff cannot maintain a § 510 claim.

Under Defendant's policies, only "active full-time" employees were entitled to employment benefits. Defendant's employee handbook defines a "full-time" employee as an "employee who is regularly scheduled to work 32-40 hours or more per week and who's [sic] first employment obligation is to the Grosse Pointe Yacht Club." (Def. Br. Ex. Q, Employee Handbook 21). Full-time employees were eligible for medical insurance, dental insurance, vision, life insurance, short-term disability, 401K participation, and an employee assistance program. (Def. Br. Ex. R, Open Enrollment Presentation). The employee handbook further described Defendant's policies that an employee could be absent for up to twelve weeks on medical leave because of a non work-related health condition. (Def Br. Ex. Q 32). Upon request, Defendant would allow for an extended medical leave of absence, not less than three months, and not more than six months, upon the employee's request and with supportive documentation. (*Id.* at 31). Defendant's policy also continued medical insurance benefits for full-time employees on medical leave for not less than three months and retained their seniority and benefit eligibility status. (*Id.*).

21

At issue in this matter are two employee benefits that Plaintiff received from Defendant: (1) disability benefits and (2) medical benefits. Plaintiff went on medical leave for a non work-related health reason in November 2003. Defendant argues that, as of the date of Plaintiff's termination on October 20, 2004, it was no longer obligated to pay Plaintiff's health benefits, since Plaintiff had already received the maximum health benefits under the medical leave policy, and could not return to work in her former position, due to her lifting restrictions.

Plaintiff received short-term disability benefits until February 2004, at which time she began collecting long-term disability benefits. (Def. Br. 17). Plaintiff continued to receive long-term disability benefits until February 2006. Plaintiff received the full extent of available disability benefits provided by Defendant's plan.

On April 21, 2004, Plaintiff requested an additional five-month extension of her medical leave through October 6, 2004, pursuant to Defendant's policies. (Def. Br. Ex. C, Apr. 21, 2004 Bommarito Letter). During this time, Defendant continued to pay Plaintiff's medical insurance benefits until Plaintiff's eventual termination on October 20, 2004. Upon Plaintiff's termination, Defendant sent Plaintiff a COBRA notice of rights, a federally-mandated extension of her group health coverage as provided by Defendant's Plan. (Def. Br. 5; Pl. Br. Ex. J, Oct. 20, 2004 Letter). Plaintiff responds that she can maintain a § 510 claim, even if Defendant is correct in stating that Plaintiff had exhausted all of the medical leave and employee benefits to which she was entitled under Defendant's policies. Further, Plaintiff argues that she has presented "direct evidence" that Defendant specifically intended to violate ERISA through the testimony of Defendant's management employees, Michael Mooney and Jan Tallerico. (Pl. Br. Ex. C, Tallerico Dep. 50:23-25, 51:1-12, 52:15-19, 53:4-11; Ex. F, Mooney Dep. 11:17-25, 12:1-2). Plaintiff also contends that

Defendant discovered that Plaintiff's lifting restriction was permanent on July 22, 2004, but did

not terminate her employment until after Defendant learned that it could discontinue health

benefits upon her termination. (Pl. Reply 4-5).

The Court finds Plaintiff's argument to be unpersuasive, since Plaintiff has not shown how

she is entitled or would be entitled to continued or future employee benefits under Defendant's

policies but for her termination. In essence, Plaintiff asserts that since Defendant continued to pay

her employee benefits, she could "reasonably rely" upon Defendant's continued payment:

> In this case, both Defendant's actions for 13 months and its employee handbook establish
> that [Plaintiff] was entitled to and did receive, until Defendant's decision to violate § 510,
> full benefits under Defendant's employee welfare benefit plans. Defendant sent her
> benefits election form in April 2004 when she had been on a medical leave for more than 6
> months and continued those benefits in full force until the date of the termination of her
> employment. . . . In short, [Plaintiff] was a participant in Defendant's employee welfare
> benefits plan with a reasonable expectation of continuing as such until Tallerico learned at
> an insurance company sponsored seminar, in response to her specific inquiry, that
> Defendant could save a few dollars by terminating [her] employment. . . .

(Pl. Br. 7-8).

The Court notes that ERISA does not "regulate the substantive content of welfare-benefit

plans." *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.*, 520 U.S.

510, 515 (1997). Defendant is "generally free under ERISA, for any reason at any time, to adopt,

to modify, or terminate [its] welfare plan," as long as it does not improperly discriminate with

Plaintiff's attainment of rights under the plan. *Id.* at 515-16.

Here, Plaintiff was not "entitled" to medical benefits under Defendant's plan when she was

terminated. Defendant has presented evidence that under its employment policies, it would grant

full-time employees up to twelve weeks medical leave for a non work-related medical conditions,

with an extension of three to six months upon request. Here, Plaintiff took the twelve weeks leave,

23

and then on April 21, 2004, requested an extension of her medical leave until October 6, 2004. After the completion of the latter extension of leave, Defendant's policies did not provide for any additional medical benefits.

Plaintiff contends that Defendant's agent admitted to Guardian, Defendant's disability benefits carrier, that Plaintiff was still an "active" employee sometime shortly before her October 2004 termination. (Tallerico Dep. 44). Defendant responds that Guardian periodically contacted Defendant to verify Plaintiff's employment status. (Def. Br. 8). The reason for this, per Defendant, was that Guardian had an interest in knowing if Plaintiff could resume her former duties for the purposes of administering her long-term disability benefits. (*Id.* at 8-9). Tallerico's contact with Guardian about Plaintiff's employment did not concern Plaintiff's medical benefits, which, under the terms of Defendant's policies, had been exhausted by October 2004. Plaintiff continued to receive her long-term disability benefits from Guardian, pursuant to the policy, until February 2006, fifteen months after her termination.

Accordingly, the Court finds that Plaintiff has not demonstrated that Defendant interfered with an employee benefit to which she was entitled. *See Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (holding that since the plaintiff cold not show that he was entitled to any present or future benefits at the time of his termination, he could not maintain an ERISA discrimination claim).

Therefore, the Court DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS Defendant's Motion for Summary Judgment on the ERISA discrimination claim.

### C.    PWDCRA, Breach of Contract, and Promissory Estoppel Claims

Since Plaintiff's federal claims have been dismissed, the Court DISMISSES WITHOUT PREJUDICE the state law claims of PWDCRA, breach of contract, and promissory estoppel. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

## III.   CONCLUSION

For the foregoing reasons, the Court:

(1)   **DENIES** Plaintiff's Motion for Partial Summary Judgment on § 510 ERISA claim;

(2)   **GRANTS** Defendant's Motion for Summary Judgment on the ADA claim and § 510 ERISA claim;

(3)   **DISMISSES WITHOUT PREJUDICE** Plaintiff's state law PWDCRA, breach of contract, and promissory estoppel claims.

**SO ORDERED.**


s/Paul D. Borman

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 26, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 26, 2007.


s/Denise Goodine

Case Manager